COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                                 NO.
2-09-140-CV

 

 

IN THE INTEREST OF
B.J., 

A CHILD

 

                                                       ------------

 

              FROM THE 231ST
DISTRICT COURT OF TARRANT COUNTY

 

                                                       ------------

 

                                      MEMORANDUM OPINION[1]

 

                                                       ------------








Appellant J.J. appeals from the
termination of her parental rights to her daughter B.J.  In twelve issues, Appellant contends that the
evidence is legally and factually insufficient to support termination,
challenges the appointment of the Texas Department of Family and Protective
Services (TDFPS) as Permanent Managing Conservator (PMC), and contends that subsections
(b) and (i) of section 263.405 of the family code are unconstitutional.  Because we hold that the evidence is legally
and factually sufficient to support termination and that Appellant has not
shown that the challenged statutory provisions have harmed her, we affirm the
trial court=s judgment.

The trial court found by clear and
convincing evidence that Appellant had (1) knowingly placed or knowingly
allowed the child to remain in conditions or surroundings that endanger her
physical or emotional well-being and (2) engaged in conduct or knowingly placed
the child with persons who engaged in conduct that endangers the child=s physical or emotional well-being.[2]  The trial court also found that termination
of the parent-child relationship would be in the child=s best interest.[3]

In her first, second, third, and
fourth issues, Appellant contends that the evidence is legally and factually
insufficient to support the endangerment findings.  As we have explained in a similar case,

Endangerment
means to expose to loss or injury, to jeopardize.  The trial court may order termination of the
parent-child relationship if it finds by clear and convincing evidence that the
parent has knowingly placed or knowingly allowed the child to remain in
conditions or surroundings that endanger the physical or emotional well-being
of the child.  Under subsection (D), it
is necessary to examine evidence related to the environment of the child to
determine if the environment was the source of endangerment to the child=s
physical or emotional well-being. 
Conduct of a parent in the home can create an environment that endangers
the physical and emotional well-being of a child. 

 








.
. . . Under subsection (E), the relevant injury is whether evidence exists that
the endangerment of the child=s physical or emotional well-being was the direct
result of the parent=s conduct, including acts, omissions, and failures to
act.  Termination under subsection (E)
must be based on more than a single act or omission; a voluntary, deliberate,
and conscious course of conduct by the parent is required.

 

To
support a finding of endangerment, the parent=s conduct does not necessarily have to be directed at
the child, and the child is not required to suffer injury.  The specific danger to the child=s well-being
may be inferred from parental misconduct alone, and to determine whether
termination is necessary, courts may look to parental conduct both before and
after the child=s birth. . . . 
A parent=s decision to engage in illegal drug use during the
pendency of a termination suit, when the parent is at risk of losing a child,
supports a finding that the parent engaged in conduct that endangered the child=s
physical or emotional well-being.  Thus,
parental and caregiver illegal drug use supports the conclusion that the
children=s surroundings endanger their physical or emotional
well-being.  A factfinder may also
reasonably infer from a parent=s failure to attend scheduled drug screenings that the
parent was avoiding testing because the parent was using drugs.  As a general rule, conduct that subjects a
child to a life of uncertainty and instability endangers the child=s
physical and emotional well-being.

 

Because the evidence pertaining to
subsections 161.001(1)(D) and (E) is interrelated, we conduct a consolidated
review.[4]

The trial court heard the following
evidence.  Darlene Pile, an investigator
for Child Protective Services (CPS), visited Appellant=s apartment in response to a report
of physical neglect when B.J. was eleven months old.  Pile described the report:

[T]he persons were
concerned concerning [B.J.]=s appearance. 
There was comments that her head was dirty, her nails were dirty, the
child wasn=tCwas unkept [sic]. 
TheCshe had gone to a sitter, I guess, and the child was
only provided with a sippy cup, ramen noodles, size 4 diapers, when she only
wore a size 2 diaper.  The child was just
unkept [sic].  She was a loner.  She didn=t want to play.








When Pile investigated at the sitter=s house, the sitter had already
bathed B.J., but Pile noted that the sippy cup was dirty and contained only
about an inch of fluid and that Appellant had not left any milk or clean
clothes for B.J.  Pile reported that
although Appellant, B.J., and their apartment were clean when she later visited
Appellant, no food appropriate for an eleven-month-old was available in the
home.  Pile testified that when asked why
there was no milk, Appellant claimed that B.J. was lactose intolerant.  Pile also testified that Appellant told her
that she did not need WIC because B.J. did not drink milk.  Appellant testified that she never told
anyone that B.J. was lactose intolerant but that she did tell CPS that B.J. did
not like white milk.

B.J. was admitted into Cook Children=s Hospital on January 24, 2008, one
week before her first birthday.  Hospital
personnel noticed that when they arrived, both Appellant and B.J. had hygiene
issues.  B.J.=s blanket was filthy, and the
crevices in her sippy cup contained dirt.

B.J. was diagnosed with cellulitis
and failure to thrive.  Even with an
armboard attached for an IV, B.J. weighed only 16 pounds and 7.3 ounces, the
minimum for what doctors would have expected for a seven-month-old.  She was below the fifth percentile for weight
of babies in her age group in the United States.  There was evidence that Appellant informed
medical personnel that B.J. was a picky eater, refusing milk and Aother things which most children
like.@








Dr. Kevin Wylie, B.J.=s attending physician at Cook
Children=s Hospital, testified that B.J.=s failure to thrive was most likely
caused by undernourishment and malnutrition. 
Importantly, the doctor made clear in his testimony that the problem was
not just that Appellant was giving B.J. inappropriate food.  He stated that B.J. had been Agetting insufficient food@ and Ainsufficient caloric intake@ and that the most important part of solving B.J.=s problem was just A[f]eeding her.@ 
Her low weight placed her at risk for developmental problems.  Further, at the hospital, B.J. was observed
not to be a picky eater, drank milk with no problem, and began gaining
weight.  Dr. Wylie testified that she ate
Amore than what would be expected for
her weight.@

Dr. Wylie was concerned that
Appellant could not adequately care for B.J. because of the medical history
Appellant provided, which showed that B.J. was two sets of immunizations behind
schedule; B.J.=s poor hygiene and low weight upon
arrival; Appellant=s interactions in the hospital; and
the fact that B.J. thrived in the hospital.

There was evidence that Appellant was
not taking her bipolar medication regularly. 
Dr. Wylie testified that his notes indicated that Appellant had told the
nurses that she could not pay for her bipolar medicine, but they observed that
she purchased Starbucks products frequently. 
Appellant testified that she took her medication regularly but admitted
to not taking it for Aa couple of weeks@ in 2008 when she did not have it.








Dr. Wylie testified that Appellant
was inexplicably belligerent and confrontational at the hospital.  He stated that his impression was that her
regard for B.J.=s health was not where it would be
for the average patient, and that his baseline was pretty low.  As an example, he testified that she got
upset when she was told that B.J. would have to stay in the hospital longer,
not because of any concern for B.J. but because Appellant wanted to go
home.  Appellant admitted at trial that
B.J. had been two sets of immunizations behind, that is, the baby had no
immunizations or checkups between the ages of two weeks and four months,
because Appellant was working and did not have time to get B.J. timely medical
care.

While B.J. was in the hospital,
medical staff explained the long-term ramifications of inadequate nutrition to
Appellant; however, she continued to provide inappropriate nutrition to B.J. by
giving the child soft drinks, chips, and other junk food.  Furthermore, there was evidence that
Appellant, who was a certified nursing assistant at the time, had attempted to
remove B.J.=s IV to change her diaper without
consulting any of the hospital staff. 
Appellant denied in her testimony that she had attempted to remove the
IV and testified that she had helped a nurse unhook or disconnect it when the
nurse was changing out the IV.








Dr. Wylie recommended placing B.J.
upon discharge where CPS could be sure that she would get food to confirm that
her problem was lack of appropriate nutrition instead of an obscure medical
problem.  B.J. was placed in foster care
upon her discharge from the hospital. 
She gained about eleven and a half ounces within a week, and by the time
she saw a pediatrician two months after her hospitalization, she weighed twenty
pounds and was back on a normal growth curve. 
Her pediatrician opined that she had made a Adramatic improvement.@ 
At her last checkup before trial, B.J. weighed 24.8 pounds.

The foster mother testified that B.J.
ate peas and drank milk the night she arrived. 
In describing B.J.=s initial appearance, the foster
mother testified, 

She
came to me reminding me so much of my daughter that I went to Latvia for. . .
.  She had that orphanage look, which is
a very blank, very sad, very lonely look. 
And I could put her down and blow on her belly and tickle her and she
didn=t respond.

 

She
never cried for food.  I had to put her
on aCjustCyou eat breakfast; you eat snack; you eat lunch; you
eat snack; you eat dinner; you get your bottle; you drink it; you go to
bed.  It took a while before she actually
knew to cry for any type of food or ask for it. 
The day she first started asking for food, I was so excited, I called my
husband up at work.

 

During the pendency of the case,
Appellant committed the state jail felony offense of theft of a vehicle.  She pled guilty to the offense and was placed
on deferred adjudication community supervision. 
At the time of the termination trial, Appellant was still on deferred
adjudication community supervision but had been threatened with revocation
unless she completed drug treatment.  She
had been discharged from drug treatment in December 2008 for noncompliance.








Appellant admitted that she had used
marijuana on and off since she was fourteen years old.  She admitted to smoking marijuana during both
of her pregnancies and during the pendency of both the CPS case and her
deferred adjudication community supervision, violating the terms of her
community supervision.  She tested
positive for marijuana on three separate occasionsCDecember 22, 2008, February 26, 2009,
and March 27, 2009.  She refused to take
a urine test for CPS in March 2009 but testified that she had smoked marijuana
less than a month before trial.

Applying the appropriate standard for
reviewing the legal sufficiency of the evidence,[5]
we hold that, based upon our review of the record, the evidence is legally
sufficient to support the trial court=s endangerment findings regarding Appellant under subsections
(D) and (E).  Further, applying the appropriate
standard for reviewing the factual sufficiency of the evidence,[6]
we hold that, based upon our review of the record, the evidence is factually
sufficient to support those findings.  We
overrule Appellant=s first, second, third, and fourth
issues.

Along with a best interest finding, a
finding of only one ground alleged under section 161.001(1) is sufficient to
support a judgment of termination.[7]  We therefore do not reach Appellant=s fifth and sixth issues.[8]








In her seventh and eighth issues,
Appellant contends that the evidence is legally and factually insufficient to
support the trial court=s finding that termination of
Appellant=s parental rights is in B.J.=s best interest.  In addition to the above evidence, there was
also evidence that Appellant failed to satisfy several requirements set forth
in her CPS family service plan.  Specifically,
she failed to go to personal individual counseling; failed to follow through
with drug assessment; and refused to take a drug test.

Additionally, instead of attending
parenting classes set out in her service plan, Appellant opted to take
parenting classes from Safe Haven. 
However, she was unable to provide documentation of attendance or
completion upon request.  After taking
parenting classes, she refused to change B.J.=s wet diaper during a CPS visit, indicating an inability to
appropriately parent the child.  Also
during visitation, Appellant spoke inappropriately to the child, both speaking
to her as she would an adult and becoming overly frustrated with the
child.  Appellant did not visit B.J. as
often as she was allowed.  In fact, she
only visited her daughter seventeen times out of thirty-two opportunities given
to her by CPS.  In October 2008, she
failed to visit her daughter at all. 
Appellant testified that she missed visits to meet other service plan requirements,
such as working and attending MHMR appointments, and because of transportation
issues.








Appellant was unable to maintain
stable housing throughout the duration of the case.  From August 1, 2008, to the time of trial,
Appellant resided at at least seven different places, including a shelter.  At trial, she resided in a rented home with a
friend.  Appellant=s name was not on the lease, which
had expired.

Appellant was also unable to maintain
stable employment throughout the duration of the case.  From August 2008 to February 2009, Appellant
had six different jobs.

Appellant testified that B.J. hugs
her, calls her Mama, and is sad at the end of visits.  She also testified that her present residence
was safe and child-friendly and that she would not smoke marijuana again.  She insisted that she was not an addict and
that smoking marijuana was a choice.  She
did not believe that her parental rights should be terminated because of Afour pounds.@

The CPS caseworker testified that
termination of Appellant=s parental rights would be in B.J.=s best interest because

[Appellant] has not shown any significant stability during
this case.  She seems to believe that she
hasn=t done anything wrong.  SheCshe doesn=t feel that she needs the medical
treatment.  She doesn=t feel that her child was being
neglected, and she feels that her child should be returned to her.  And she just hasn=t acknowledged her part in this case.








The evidence showed that Appellant=s father had custody of her son, whom
she had not seen for more than a year at the time the CPS case began, but the
grandfather did not want to be considered as a potential placement for
B.J.  The foster mother, on the other
hand, testified that she loves B.J. and wants to adopt her, and that she and
her husband, children, and parents are all bonded to B.J.  When describing B.J.=s transformation from the time she
arrived, the foster mother testified,

She=s gone from that to this little girl that has a mind of her
own and tells you what she thinks and speaks and loves her siblings and loves
us and we love her and she=s happy and she giggles and you can
tickle her and you can play with her; and that blank look, that orphanage look,
is gone. 

The CPS caseworker testified that
B.J. was thriving and happy in the foster home and very bonded.  B.J. talks a lot, runs and plays, and is
learning a lot.  She calls the foster parents
Mom and Dad and looks to them as her parents. 
TDFPS=s plan at trial was for B.J. to be
adopted by her foster parents if her birth parents= rights were terminated.

Applying the appropriate standards of
review, we hold that the evidence is legally[9]
and factually[10]
sufficient to support the best interest finding, and we overrule Appellant=s seventh and eighth issues. 








In her ninth and tenth issues,
Appellant contends that if we reverse the termination order based on
insufficient evidence, we should also reverse the appointment of TDFPS as PMC
on the same grounds.  Because we hold
that the evidence is legally and factually sufficient to support the
termination of Appellant=s parental rights, we overrule her
ninth and tenth issues.

In her eleventh and twelfth issues,
Appellant contends that subsections (b) and (i) of section 263.405 of the
family code are unconstitutional.  But
Appellant filed a timely statement of issues and motion for new trial and
directs this court to no injury she suffered as a result of the subsections
complained of.  Accordingly, Appellant
has not shown that the subsections are facially unconstitutional or
unconstitutional as applied to her.[11]  We therefore overrule her eleventh and
twelfth issues.

Having overruled Appellant=s twelve issues, we affirm the trial
court=s judgment.

 

 

LEE
ANN DAUPHINOT

JUSTICE

 

PANEL:  LIVINGSTON, DAUPHINOT, and MEIER, JJ.

 

DELIVERED:  April 15, 2010











[1]See Tex. R.
App. P. 47.4.





[2]See Tex.
Fam. Code Ann. ' 161.001(1)(D), (E) (Vernon Supp. 2009).





[3]See id. ' 161.001(2).





[4]In re J.W.,
No. 02-08-00211-CV, 2009 WL 806865, at *4B5 (Tex. App.CFort Worth Mar. 26, 2009, no pet.) (mem. op.)
(citations omitted); see also In re J.O.A., 283 S.W.3d 336, 345B46 (Tex.
2009).





[5]See In re
J.P.B., 180 S.W.3d 570, 573B74 (Tex. 2005).





[6]See In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006); In re C.H., 89 S.W.3d 17, 28
(Tex. 2002).





[7]In re E.M.N.,
221 S.W.3d 815, 821 (Tex. App.CFort Worth 2007, no pet.).





[8]See Tex. R.
App. P. 47.1.





[9]See Tex.
Fam. Code Ann. ' 263.307(a), (b) (Vernon 2008); In re R.R.,
209 S.W.3d 112, 116 (Tex. 2006); J.P.B., 180 S.W.3d at 573B74; Holley
v. Adams, 544 S.W.2d 367, 371B72 (Tex. 1976).





[10]See Tex.
Fam. Code Ann. ' 263.307(a), (b); R.R., 209 S.W.3d at 116;
H.R.M., 209 S.W.3d at 108; C.H., 89 S.W.3d at 28; Holley,
544 S.W.2d at 371B72.





[11]See City of Corpus Christi v. Pub. Util. Comm=n, 51 S.W.3d 231, 240B41 (Tex. 2001) (providing requirements of successful
facial challenge); Tex. Workers= Comp. Comm=n v. Garcia,
893 S.W.2d 504, 518 n.16 (Tex. 1995) (providing requirements of successful Aas
applied@ challenge).